# In the United States Court of Federal Claims

No. 19-1568C

(Filed Under Seal: January 30, 2020)

(Reissued: February 5, 2020)

| | |
|---|---|
| **CADDELL CONSTRUCTION CO. (DE), LLC,** ) | Post-award bid protest; reasonableness of agency's evaluation of an offeror's management and organization; agency's discretion whether to seek clarification |
| Plaintiff, ) | |
| v. ) | |
| **UNITED STATES,** ) | |
| Defendant, ) | |
| **and** ) | |
| **B.L. HARBERT INTERNATIONAL, L.L.C.,** ) | |
| Defendant-Intervenor. ) | |

Dirk Haire, Fox Rothschild LLP, Washington, D.C., for plaintiff.  With him were Sean Milani-Nia, Sara Falk, and Ronni Two, Fox Rothschild LLP, Washington, D.C.

John H. Roberson, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C, for defendant.  With him were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was John W. Cox, Attorney Adviser, Office of the Legal Adviser, United States Department of State, Washington, D.C.

Mark D. Colley, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for defendant-intervenor.  With him were Sonia Tabriz and Michael E. Samuels, Arnold & Porter Kaye Scholer LLP, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was filed initially under seal.  The parties were requested to review this decision and provide proposed redactions of any

LETTOW, Senior Judge.

Plaintiff Caddell Construction Co. (DE), LLC ("Caddell") protests the decision of the United States Department of State ("State Dep't" or "the agency" or "the government") to award an international embassy construction contract to B.L. Harbert International, L.L.C. ("BLH" or "the awardee"). The solicitation sought the lowest-priced technically acceptable offeror for design-build services for a new embassy compound in Podgorica, Montenegro. As relief, Caddell seeks a judgment declaring that the contract award to BLH was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and regulations, and an injunction directing the agency to take corrective action. Compl. at 30-31, ECF No. 1. On October 9, 2019 Caddell filed a motion for a preliminary and permanent injunction. ECF No. 5.[2]

Before the administrative record was filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"), Caddell filed a motion to supplement the administrative record. *See* Pl.'s Mot. to Supp. the Admin. Record. ("Pl.'s Mot. to Supp."), ECF No. 22. The government responded in opposition, *see* Def.'s Resp. to Pl.'s Mot. to Supp., ECF No. 28, and Caddell replied, *see* Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. to Supp., ECF No. 31.

Caddell then filed a motion for judgment on the administrative record on November 8, 2019. *See* Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Br."), ECF No. 32. The government responded in opposition and with its cross-motion for judgment on the administrative record. *See* Def.'s Resp. to Pl.'s Mot. for Judgment on the Admin. Record and Cross-Mot. for Judgment on the Admin. Record ("Def.'s Br."), ECF No. 36. Having been granted permission to intervene, BLH also filed a response in opposition to Caddell and its cross-motion for judgment on the administrative record. *See* Def.-Intervenor BLH's Resp. to Pl.'s Mot. for Judgment on the Admin. Record and Cross-Mot. for Judgment on the Admin. Record ("BLH's Br."), ECF No. 35. Upon completion of briefing, *see* Pl.'s Reply and Resp. to Def.'s Cross-Mot. and BLH's Cross-Mot. ("Pl.'s Reply"), ECF No. 37; Def.'s Reply in Support of its Cross-Mot. ("Def.'s Reply"), ECF No. 41; BLH's Reply in Support of its Cross-Mot. ("BLH's Reply"), ECF No. 40, a hearing was held on January 10, 2020.

---

confidential or proprietary information. The resulting redactions are shown by asterisks enclosed by brackets, *e.g.*, "[***]." One clarifying sentence has been added.

[2]On January 17, 2020, the court issued an order deferring ruling on this motion. *See* ECF No. 42.

**FACTS[3]**

On June 12, 2019, the Dep't of State issued a solicitation for a project entitled "DESIGN-BUILD – New Embassy Compound (NEC) in Podgorica, Montenegro." AR 1-1 (capitalization in original).[4]  After a series of amendments, *see generally* AR 2; AR 3; AR 4; AR 5; AR 6; AR 7, four offerors submitted proposals, all of whom had been pre-qualified, *see* AR 21-2899. The four offerors were: (1) American International Contractors (Special Projects), Inc. ("American Int'l"), *see* AR 8; (2) BLH, *see* AR 9; (3) Caddell, *see* AR 10; and (4) Pernix Group, Inc. ("Pernix"), *see* AR 11.  The solicitation stated that the award would be made "based on an evaluation and assessment of each offeror's proposal, to the technically acceptable offeror meeting the requirement[s] of the solicitation, at the lowest price[]." AR 21-2902.  Thus, the general proposal review process consisted of first, a determination as to which proposals were technically acceptable, and then second, a ranking by price of those proposals deemed technically acceptable; ultimately, the bid with the lowest price would be the awardee.  *See* AR 21-2899.

Further, the solicitation explained that "[t]he [g]overnment intends to evaluate proposals and award a contract without discussions with the [o]fferors," AR 21-2899, but, if necessary, "the [g]overnment may, at its sole discretion, request additional information from offerors clarifying or supplementing any proposal as submitted," AR 21-2900.  Additionally, the solicitation listed potential reasons why a proposal might be deemed unacceptable, including proposals that did not address "essential requirements of the Request for Proposal." AR 21-2899.

The proposals were evaluated under nine main factors.  *See* AR 21-2900 to 2902.[5]  At issue in this protest is the agency's actions with regard to its evaluation of the proposals on Factor 6: Management and Organization.  AR 21-2901.  Factor 6 was split into three Subfactors: (1) "Offeror's Organization for the Project;" (2) "Staffing Approach and Key Resumes;" and (3) "Subcontractor Management Program," AR 21-2901, here, the most relevant of the three being Subfactor 2 on staffing.  The first section of Subfactor 2 listed the specifications for explaining staff transitions onto the project, requiring that the offeror "[p]rovide, in table format, a breakdown of all of the [o]fferor's project management manpower resources, the projects to

---

[3]The following recitations constitute findings of fact by the court from the administrative record of the procurement filed pursuant to RCFC 52.1(a).  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[4]The government filed the administrative record on October 25, 2019, *see* ECF No. 24.  It is consecutively paginated, divided into 23 tabs, and consists of over 3,000 pages.  Citations to the record are cited by tab and page as "AR [tab]-[page]."  The record was supplemented twice: on October 29, 2019, ECF Nos. 26, 27; and on November 7, 2019, ECF Nos. 29, 30.

[5]The factors were: (1) contractor technical project experience; (2) contractor past performance; (3) designer project experience; (4) designer past performance; (5) technical approach and risk; (6) management and organization; (7) safety program; (8) worker recruitment plan; and (9) housing plan.  AR 21-2900 to 2902.

which they are currently committed, and when those commitments end." AR 21-2894.  The second section of Subfactor 2 required the offeror to "[i]dentify the extent to which the proposed construction management team . . . [and] design team ha[ve] worked together on previous projects . . . [and] with the contractor." AR 21-2894.  The final two sections of Subfactor 2 required that offerors submit resumes for certain key proposed project staffers, list their experiences, and provide "any additional pertinent information in sufficient detail to substantiate qualifications and facilitate evaluation of qualifications and technical competence." AR 21-2894.  The amount of experience required for each role was included in the solicitation's requirements more specifically.  *See, e.g.*, AR 1-354 (stating that the project engineer must have a minimum of five years of professional employment managing similar work).  The solicitation also included a brief identification of criteria for review of the offers regarding how well they conformed to the requirements.  *See, e.g.*, AR 21- 2901 (Section M.2.7 describes how Factor 6 would be reviewed).

After receiving the proposals, a price analysis was conducted, *see generally* AR 12, and then a Technical Evaluation Panel ("TEP") reviewed the proposals to provide an initial report and recommendation on the acceptability of each proposal under the solicitation's requirements, *see generally* AR 13.  The TEP assigned each proposal an overall rating as well as ratings for each factor that included a listing of strengths, weaknesses, and deficiencies.  *See* AR 13-2678.  The TEP's report explained that "weaknesses and deficiencies were carefully considered by the TEP during the evaluation.  Deficiencies were in many cases considered critical and often times indicated that certain requirements of the RFP had not been met." AR 13-2678.  Having a deficiency, however, did not automatically render a factor unacceptable in the TEP's review. AR 13-2678.  The TEP concluded that only two of the four offerors were technically acceptable overall—BLH and Caddell.  AR 13-2677.  BLH was given a rating of "acceptable" or "pass" for every single factor and only one deficiency was noted, under Factor 5.  AR 13-2679 to 2683. Caddell was given a rating of "acceptable" or "pass" for every factor, except for Factor 6, where the TEP gave Caddell a rating of "unacceptable." AR 13-2683 to 2689.  Additionally, the TEP noted eight deficiencies in Caddell's proposal, seven of which pertained to Factor 6.  AR 13-2686 to 2687.  The deficiencies given under Factor 6 related to lack of experience of key personnel working together, transitioning of key personnel from other projects, and lack of requisite experience for individual roles, among other things.  Despite these deficiencies, the TEP still considered Caddell to be acceptable overall.

The contracting officer and subsequently the source selection officer, however, came to a different conclusion regarding Caddell's acceptability.[6]  The contracting officer found Caddell to be unacceptable overall, "because the solicitation does not permit an offeror with unacceptable

---

[6]The AR did not affirmatively indicate whether the contracting officer and the source selection officer were the same person, and there appeared to be some disagreement among the parties on this fact.  *See, e.g.*, BLH's Cross-Mot. at 6 (noting that the contracting officer also served as the source selection officer). The contracting officer, James Waggoner, clarified at the hearing that he served only as the contracting officer, and that his branch chief, Mr. James Thomas, Jr., served as the source selection officer.  *See* Hr'g Tr. 32:15-22 (January 10, 2020) (subsequent citations to the hearing transcript will omit the date).

key personnel to be rated overall acceptable." AR 14-2708. Therefore, BLH was considered to be the only technically acceptable offeror. In the price negotiation memorandum, the contracting officer and source selection officer concluded that, "Based on the technical acceptability of B.L[.] Harbert International's proposal and lowest price at 11% lower than the [independent government cost estimate], it was determined in the best interest of the [g]overnment to make award without discussions." AR 14-2708. Caddell and the other unsuccessful offerors were notified on September 24, 2019 that the contract had been awarded to BLH. *See generally* AR 16; AR 17.

Caddell filed this protest on October 9, 2019. *See generally* Compl. Caddell's challenge includes six grounds for overturning the agency's award decision, including: that the agency relied on unstated evaluation factors for (1) transition of key personnel and (2) experience for key personnel working together; (3) that the agency improperly marked personnel as not having the requisite experience; (4) that the agency gave Caddell disparate treatment in its evaluation; (5) that the agency improperly treated Factor 6 as a mandatory minimum; and (6) that the agency abused its discretion by failing to seek clarifications from Caddell. *See* Compl. ¶¶ 6-11; Pl.'s Br. at 19-49.[7] Caddell argues that, "But for these procurement errors, Caddell's proposal would have been deemed 'Acceptable' and it would have been awarded the [c]ontract as the lowest priced, technically acceptable bidder." Compl. ¶ 12. The court, however, disagrees, finding that the agency properly awarded the contract to BLH.

## STANDARDS FOR DECISION

The Tucker Act vests this court with jurisdiction "to render judgment on an action by an interested party objecting to a . . . proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Standards set forth in the Administrative Procedure Act ("APA"), codified in relevant part at 5 U.S.C. § 706, govern the court's review of a protest of a government contract award. *See* 28 U.S.C. 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under 5 U.S.C. § 706(2)(A), the court may set aside an agency's procurement decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The court's determination is subject to the traditional balancing test applicable to a grant of equitable relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004); *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 550 (2014).

The court shall not "substitute its judgment for that of the agency," *Hyperion*, 115 Fed. Cl. at 550 (quoting *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (in turn

---

[7]Caddell's complaint also included an allegation that the agency improperly gave Caddell a deficiency for failing to include accepted positions and acknowledged salaries for Caddell employees because this was not required by the solicitation. *See* Compl. ¶ 8. The government concedes that this deficiency was given in error. *See* Def.'s Br. at 26. But this error on the agency's part is not by itself enough to show prejudice, that is, "a substantial chance [Caddell] would have received the contract award but for that error." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977))).  The court may overturn the government's procurement decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  In conducting the rational basis analysis, the court looks to whether the "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni*, 238 F.3d at 1333), and affords "contracting officers . . . discretion upon a broad range of issues," *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (quoting *Impresa Construzioni*, 238 F.3d at 1332-33).  Accordingly, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech*, 554 F.3d at 1037 (citation omitted).  Protests alleging a violation of regulation or procedure "must show a clear and prejudicial violation."  *Axiom*, 564 F.3d at 1381 (quoting *Impresa Construzioni*, 238 F.3d at 1333).

## ANALYSIS

This case presents essentially one main question: did the agency properly find Caddell's proposal to be overall technically unacceptable?  While Caddell's main arguments center around the agency's evaluation of Factor 6, ultimately Caddell argues that even if Factor 6 was properly found by the agency to be unacceptable, it was improper for the contracting officer to find Caddell overall technically unacceptable, particularly in light of the TEP's opposite conclusion.  Caddell's arguments fail in all fronts.  The agency acted properly and within its authority both in rating Caddell as unacceptable in Factor 6 and overall.

### A. Factor 6, Subfactor 2, Section 1: Transition of Key Personnel

Under Factor 6, Caddell was assigned a deficiency that stated as follows: "7 of the 9 key positions for this project are to be filled by people presently working at other [Bureau of Overseas Building Operations] projects (but will be available? - how does this affect the other projects?)."  AR 13-2687.  Caddell contends that that agency's "assignment of this deficiency relies on an unstated evaluation factor that was not required by the [s]olicitation or indeed, even accommodated for by the terms of the [s]olicitation."  Pl.'s Br. at 29.  Particularly, Caddell argues that by including in its offer a chart of all current projects for key personnel, *see* AR 10-2253 to 2254 (charts of personnel commitments included in Caddell's proposal), and an indication that "proposed [k]ey [p]ersonnel would be available when the Podgorica project received the Notice to Proceed," Pl.'s Br. at 30, it met the requirements of the solicitation Factor 6 Subfactor 2 in providing a "breakdown of all . . . the projects to which [personnel] are currently committed, and when those commitments end," AR 21-2894, and that "[t]he [s]olicitation did not require explanations of how [k]ey [p]ersonnel on other projects would be transitioned off those projects, or how those projects would be impacted," Pl.'s Br. at 30.

The government counters that the agency's evaluation of whether the transition of staff from one project to another was feasible was a consideration intrinsic to the solicitation's

request. *See* Def.'s Br. at 30 ("Certainly, [the agency's] consideration of this dynamic was 'intrinsic' to the request for information concerning current and proposed staffing of [k]ey [p]ersonnel, and thus cannot fairly be considered an undisclosed factor."). The government argues that the agency's concern in assigning Caddell a deficiency was a "common sense reason," in that the agency "did not want to be subject to a 'bait and switch' where an offer is secured with certain personnel but other key staff actually arrive to perform the work." *Id*. at 30; *see also* BLH's Br. at 19-20 (noting the agency's likely concern for a "bait-and-switch"). BLH's main counterargument varies slightly from the government's, maintaining that while transition details may be intrinsic to the government's request for information, ultimately the solicitation explicitly required that the contractor provide when the commitments of its staffers end, and Caddell failed to do so. *See* Hr'g Tr. 53:5-7.

The court agrees with the government and BLH that the agency acted reasonably in assessing Caddell this deficiency. "As a matter of law, the court employs traditional rules of contract interpretation when interpreting a solicitation." *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 531 (2010). Accordingly, the starting point is the plain language of the solicitation. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004); *PHT Supply Corp. v. United States*, 71 Fed. Cl. 14 (2006). Here, the solicitation explicitly included a requirement that the offer include "when those commitments end." AR 21-2894. Caddell's proposal only noted that key personnel would be available on the date the notice to proceed is issued. *See* AR 10-2253. The notice to proceed is not a set date or even a date range, and thus Caddell was only moderately responsive, at best, to the solicitation. Contrary to Caddell's assertion that its response was more precise than the other bidders, *see* Hr'g Tr. 12:3-25, under the terms of the solicitation, Caddell did not provide the required information, *cf.* AR 9-1860 to 1861 (chart in BLH's proposal, setting out exact [***] for key personnel staffed on other projects).

Furthermore, "plaintiff must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation," to prevail on a claim that the agency used an undisclosed evaluation factor. *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997). The court is simply not convinced that the agency's transition concerns were *significantly different* than its explicit request for staffing information and its consideration of the "offeror's staffing approach." AR 21-2901. It was entirely reasonable for the agency to express concern over exactly when and how Caddell's key personnel would be available, given that these personnel were already assigned to other agency projects. The agency's focus on whether Caddell's key personnel would be available when necessary without additional negative domino effects on the agency's other projects "intrinsic to the stated factors." *PHT Supply*, 71 Fed. Cl. at 13 (citations omitted). Therefore, the agency was not required to explicitly list this exact element in the solicitation, *id.*, and it acted within its authority in assessing Caddell a deficiency on these grounds.

### B. Factor 6, Subfactor 2, Section 2: Working Together

Caddell was also assigned a deficiency for the lack of experience of key personnel working together. Specifically, the TEP found that, "The designated [k]ey players have had VERY limited experience with each other." AR 13-2687 (emphasis in original). As with the

previous challenge, Caddell asserts that this deficiency was improperly assessed because its proposal included a chart showing all the projects on which its personnel have worked together, *see* AR 10-2255, and the agency's assignment of this deficiency thus rests on an "unstated minimum requirement," Pl.'s Br. at 33.  Caddell then argues that "where an evaluation factor is a mandatory minimum requirement, such that it can be a basis for disqualifying a proposal from award, it must be clearly stated in the [s]olicitation." *Id.* (citing *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2001)).

Caddell's argument misstates the agency's assessment of this deficiency.  It is not that the agency decided that each offeror had to present a specific minimum amount of experience to meet the requirements of this factor.  Rather, the agency, armed with its expertise in staffing these projects, made a determination that the amount of experience working together that Caddell's specific proposed team members possessed was not sufficient to provide the "professional level of [p]roject execution management," AR 1-353, necessary for this embassy project.  Additionally, in a project of this scope with a relatively large number of team roles, it would be difficult for the agency to particularly quantify the amount of experience necessary.  Given that offerors could establish the requisite experience in a multitude of ways, no one way necessarily better than the other, the "working together" evaluation is by nature somewhat qualitative, requiring the agency to make a case-by-case assessment.  Therefore, that the agency made a determination that Caddell's team did not have the requisite experience is not enough to show that the agency had some unstated minimum.  Instead, it was entirely rational for the agency to assess a deficiency after reviewing Caddell's proposal.

### C.  Factor 6, Subfactor 2, Sections 3 and 4: Required Experience

Four other deficiencies were assessed to Caddell under Factor 6 for failing to include personnel who had the required amount of work experience.  *See* AR 13-2687 (noting that the project engineer, security manager, quality control manager, and project controls engineer did not have the required work experience).  Caddell alleges that these deficiencies were "erroneously assigned" because their proposed employees each in fact possessed the required experience for their respective roles prescribed by the solicitation.  Pl.'s Br. at 34.  Additionally, Caddell alleges that because the proposed personnel have been found acceptable by this same agency on other solicitations, it was arbitrary and capricious to find them unqualified here.  *Id.* at 35.[8]

---

[8]As an initial matter, because Caddell's arguments rely in part on evidence presented in Caddell's motion to supplement the administrative record, the court must first rule on that motion.  A "part[y's] ability to supplement the administrative record is limited," *Axiom*, 564 F.3d at 1379; supplementation should only be allowed when "the omission of extra-record evidence precludes effective judicial review," *id.* at 1380 (citing *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  Caddell seeks to supplement the record with "specifications, resumes, and submittals related to substantially similar [agency] projects on which the key personnel at issue in this protest were deemed acceptable." Pl.'s Mot. to Supp. at 2.  This motion to supplement is DENIED.  Plaintiff has not shown that these documents, which come from separate solicitations for separate projects with different requirements not before the contracting officer in this procurement, are necessary for judicial review in this case.  The record

Both the government and BLH assert that the agency correctly found that each of these proposed personnel did not have the required experience. *See* Def.'s Br. at 34-40; BLH's Br. at 36. The court agrees. Here, the specification was explicit on the experience required for each position. *See, e.g.*, AR 1-354 (requiring that the project engineer have a "[m]inimum of 5 years of professional employment managing comparable work"). Additionally, the specification placed the burden on the offeror to demonstrate that its proposed personnel possessed these necessary qualifications. *See* AR 21-2894 (noting that the offeror shall include "any additional pertinent information in sufficient detail to substantiate qualifications and facilitate evaluation of qualifications and technical competence" with the resumes submitted for each team member).

Caddell argues that the agency misunderstood the submitted resumes when calculating the relevant work experience of each of its personnel and that the agency could have sought clarification about past roles if they were unsure. *See* Hr'g Tr. 18:10 to 19:8. But this argument wrongfully places the burden on the agency to request follow-up clarifications. Caddell cannot criticize the agency for failing to understand its proposal, when Caddell itself had the onus to present a thorough and informative description for each of its proposed key personnel and their relevant work experience.[9] Further, the government suggests that this was not a situation where the agency misunderstood the submission by Caddell, but rather the agency's studied determination that proposed team members' past experiences were not the kind of experiences sufficient to meet the requirements of the solicitation. *See, e.g.*, Def.'s Br. at 34-35 (arguing that the agency simply disagreed with Caddell, finding the project manager's experience comparable only for 3 years, discounting experiences in roles relating only to "high-level home office management"). In this case, Caddell presents merely "disagreement with the agency's decision," *Kvichak Marine Indus., Inc. v. United States*, 118 Fed. Cl. 385, 391 (2014), not evidence that the agency's actions were the product of an irrational process.

Caddell further submits that the agency's conclusion that its personnel did not meet the required experience was arbitrary and capricious because these proposed team members "had previously been deemed [a]cceptable on other [agency] projects of similar scope and size." Pl's Br. at 39. Caddell, in part, relies on its exhibits from its motion to supplement the administrative record, *see, e.g.*, *id*. at 36, which are not in record before this court, and thus, arguments solely relying on these documents will not be addressed. The court, however, does have evidence in the record that a number of Caddell's proposed personnel were currently staffed on other projects for the agency, in the same or similar roles. *See, e.g.*, AR 10-2260 (showing Caddell's proposed project engineer for this solicitation as currently staffed as the project engineer on an embassy project in Greece for the agency). But this evidence is not enough to show that the agency acted arbitrarily and capriciously in finding the proposed personnel lacking in the requisite experience. That the agency, in a separate procurement with different specifications, may have found a

---

before the court, which contains all of the documentation from *this* agency procurement, is sufficient for the court to determine if the agency's actions were proper.

[9]Caddell even seems to agree that it could have been more detailed in its explanation to the agency of how its proposed personnel met the required experience minimums. *See* Hr'g Tr. 17:15-19.

proposed team member acceptable for the same position in that project, does not require that the agency find the same way in this procurement. *See SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001) ("The court is not persuaded that the rational basis for the . . . determination in this procurement should be second-guessed, either because of a different evaluation of [an offeror] in a separate procurement or for any other reasons adduced by plaintiff."). Just as in *SDS Int'l*, the court will not look to the agency's actions in other procurements and concludes that the agency had a rational basis for its decision to assess Caddell deficiencies for underqualified proposed personnel in this procurement.

### D.  Factor 6: Disparate Treatment

With regard to the TEP's finding that Caddell's proposal was unacceptable for Factor 6, Caddell argues that it received disparate treatment, because the TEP found two other offerors, Pernix and American Int'l, to be acceptable for Factor 6, despite assigning them similar weaknesses and deficiencies. *See* Pl.'s Br. at 23-24. More specifically, Caddell argues that [***]'s proposals were assessed weaknesses whereas Caddell received a more stringent mark of deficiency for the same areas, and thus, Caddell was treated unfairly. *See id.* at 23-27. The government and BLH respond by arguing that the issues with each of these three proposals were not identical, nor even comparable, and therefore, do not demonstrate disparate treatment. *See* Def.'s Br. at 23; BLH's Br. at 16.

Caddell received two weaknesses and seven deficiencies for Factor 6, AR 13-2687; [***] received seven weaknesses and no deficiencies for Factor 6, AR 13-2694 to 2695; and [***] received seven weaknesses and two deficiencies for Factor 6, AR 13-2700. Even though Caddell received fewer weaknesses, it received significantly more deficiencies than these two competitors, and deficiencies were noted as more severe than weaknesses by the agency, with deficiencies being "considered critical and often times indicat[ing] that certain requirements of the RFP had not been met." AR 13-2678. Further, while Caddell received deficiencies relating to transitioning, working together, and work experience, *see* AR 13-2687, [***]'s deficiencies related to a late arrival of one staffer to the site and some missing staff titles and contact information, *see* AR 13-2700. These deficiencies are not of the same kind.

But even if Caddell's arguments were persuasive, and some of its deficiencies should have been only weaknesses, ultimately, the TEP (and eventually the contracting officer) conducted a holistic review of all of the pros and cons of each proposal under the factor, and assigned a rating for each based on its discretion, experience, and the project's requirements. The agency, not the court, is in a better position to judge the sufficiency of each proposal on the basis of these strengths, weaknesses, and deficiencies, and no re-weighing of the factors by the court is necessary. Particularly on a judgment call such as this, where field experience and expertise prove helpful in making a decision, the agency's evaluation here to rate Caddell as unacceptable for Factor 6 was not arbitrary or capricious and is well-grounded in the record evidence.[10]

---

[10]Caddell put forth similar arguments of disparate treatment relating to how the agency evaluated their proposal on transitioning. *See* Pl.'s Br. at 31-32. For the reasons stated in this section, that argument is unpersuasive.

### E.  Factor 6: Mandatory Minimum

Caddell next takes issue with the finding by the contracting officer that Caddell was unacceptable overall because it relies on the finding that Caddell's offer was unacceptable for Factor 6, essentially rendering Factor 6 an undisclosed mandatory minimum.  *See* Pl.'s Br. at 20. To support this allegation, Caddell points to a statement in the Price Negotiation Memorandum: "Although the TEP found Caddell Construction Co (DE) LLC overall acceptable, the contracting officer disagreed because the solicitation does not permit an offeror with unacceptable [k]ey [p]ersonnel to be rated overall acceptable."  *Id.* at 21 (quoting AR 14-2708).  Additionally, Caddell argues that it was inappropriate for the contracting officer to disagree with the TEP in concluding that Caddell's proposal was overall unacceptable, because the TEP found the proposal to be overall acceptable, even after finding that Caddell was unacceptable under Factor 6.  *See id.* ("There is also no legal authority or [s]olicitation specification supporting the contracting officer's erroneous opinion to overrule the [TEP], to disqualify Caddell from award, and to award the [c]ontract to BLH.").

In response, both the government and BLH assert that all offerors were on notice that the failure to meet the requirements for any of the technical factors could result in being eliminated from consideration.  *See* Def.'s Br. at 20; BLH's Br. at 8.  The court agrees.  Section M.2, AR 21-2899 to 2904, outlines the criteria under which the TEP and contracting officer would evaluate the proposals.  Section M states that the agency may deem a proposal unacceptable if: (1) "It does not represent a reasonable initial effort to address itself to the essential requirements of the Request for Proposal," AR 21-2899; or (2) "It contains major deficiencies which discussions with [offeror] could not be reasonably expected to cure," AR 21-2899.  This provision is not ambiguous.  The agency was free to eliminate from consideration any proposal that contained deficiencies it deemed too important to be overlooked.  Just as with Caddell's arguments about a work experience mandatory minimum, here, the agency did not decide in advance that Factor 6 was a mandatory minimum, but instead, upon review of each submission, considered the deficiencies assigned, and determined if these deficiencies rendered the proposal unacceptable, that is, unable to meet "the essential requirements of the Request for Proposal." AR 21-2899.  Lastly, Caddell's argument that the contracting officer could not overrule the findings of the TEP has no merit.  Contracting officers and source selection officers are free to disagree with the findings of lower-level evaluators.  *See DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 515 (2008) (citing *L-3 Commc'ns Integrated Sys. v. United States*, 79 Fed. Cl. 453, 462 (2007), and *Speedy Food Serv. Inc.*, B-258537, 1995 WL 317603 at *4 (Comp. Gen. 1995)). Thus, the source selection officer acted within his authority to accept the recommendation of the contracting officer, even though it was contrary to the conclusion of the TEP.

### F.  Factor 6: Clarifications

Caddell's final argument is that, "[t]he [a]gency abused its discretion by not requesting clarifications from Caddell," Pl.'s Br. at 46, particularly relating to the experience of its proposed key personnel and the transition of its key personnel, *see id.* at 46-49.  Part of Caddell's arguments rely on a comparison to other procurements not in record, *see, e.g.*, *id.* at 48, and as such, are not considered by this court.  With regard to Caddell's general argument that the agency should have sought clarifications from Caddell, the court agrees with the government and

BLH that "a contracting officer's decision 'to seek (or not to seek) clarification from an offeror is within the [contracting officer's] discretion.'" Def.'s Br. at 42 (referring to FAR § 15.306(a)(1)) and citing *RX Joint Venture, LLC v. United States*, 140 Fed. Cl. 13, 22 (2018)); *see also* BLH's Br. at 36-37 (citing the same). Further, under this court's precedents, "[p]rocurement officers have authority to act regarding clerical errors in bid proposals, but that authority varies depending on the type of procurement at issue—*i.e.*, sealed bidding or negotiated procurement." *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 508 (2013). Where sealed bids are concerned, a contracting officer has a mandatory duty to act to seek clarification "where the contracting officer has reason to believe that a mistake may have been made." *Id.* at 509 (citing FAR § 14.407-1). "In contrast[,] . . . the regulatory provisions regarding mistakes discovered before award in bids for negotiated procurements are largely discretionary." *Id.* (citing FAR § 15.306(a)(1)-(2), allowing "clarification of certain aspects of proposals or to resolve minor or clerical errors without the initiation of 'discussions.'"); *see also Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003) (discussing the difference between discretionary clarifications and discussions). In context, Caddell's contentions seemingly correlate more to discussions rather than clarifications. Regardless, because there was no apparent minor or clerical error, the agency did not abuse its discretion in failing to seek clarifications from Caddell.

## CONCLUSION

For the reasons stated, the court finds that at most, although this procurement suffered from one admitted error, it was not prejudicial in nature to Caddell given the other properly assessed deficiencies in Caddell's proposal. As such, the court GRANTS the government's cross-motion for judgment on the administrative record as well as BLH's cross-motion for judgment on the administrative record. Caddell's motion for judgment on the administrative record is DENIED. Accordingly, Caddell's motion for a preliminary and permanent injunction is also DENIED. Lastly, as explained *supra*, at 8 n.8, Caddell's motion to supplement the administrative record is DENIED.

The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

12